UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE SEARCH WARRANT | Case No. 3:22MJ 210 (SDV) |
| | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Andrew M. Hoffman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with the following: the cellular device assigned call number (203) 219-9777 (Target Telephone), that is in the custody or control of AT&T Wireless (referred to herein and in Attachment A as "AT&T" or "Provider"), a wireless communications service provider that is headquartered in Dallas, Texas.

2. As a provider of wireless communications service, the Provider is a service provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

3. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Service Provider to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

4. Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a

"pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C. §§ 3122 and 3213, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to and from the Target Telephone.

5. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since 1998. I am currently assigned to the Bridgeport High Intensity Drug Trafficking Area Task Force ("DEA Task Force"), which is comprised of personnel from the DEA, Connecticut State Police, Norwalk Police Department, Stamford Police Department, Stratford Police Department, and Milford Police Department. I have previously been assigned to the DEA New York Division Office in New York City and I completed a foreign assignment with the DEA Caribbean Division where I was stationed on the island of Curacao. Prior to my employment with DEA, I was employed for approximately five years as a Senior Correctional Probation Officer with the Florida Department of Corrections.

6. I have participated in dozens of narcotics and money laundering investigations and prosecutions that have resulted in convictions; testified in both United States District Court and in federal grand jury investigations, which testimony has contributed to the indictment and conviction of numerous individuals; have been the Affiant in numerous applications for federal search and seizure warrants resulting in the seizure of evidence and proceeds of drug trafficking

and money laundering; and have been the Affiant in numerous applications for criminal complaints and arrest warrants, resulting in the arrest of persons engaged in unlawful activity.

7. I am familiar with the manner and means most commonly employed by both narcotics traffickers and firearm traffickers including the manner and means by which narcotics traffickers and firearm traffickers communicate, and those methods employed by narcotics/firearm traffickers in an effort to avoid detection by law enforcement. I know that firearms are tools of trade for many narcotics traffickers.

8. From my experience, I am familiar with many of the codes, words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics. I know that drug traffickers frequently have access to several cellular telephones, and that they periodically use newly acquired cellular telephones. I also know that narcotics traffickers and distributors frequently use cellular telephones subscribed to by other persons and pre-paid cellular telephones that require the purchaser to provide little or no identifying information to purchase, activate and utilize, all of which is done in an effort to avoid detection and thwart the efforts of law enforcement. I know, based upon my training and experience, that narcotics traffickers and distributors often segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects, in an effort to thwart law enforcement and insulate themselves and their confederates. For example, drug dealers often use one telephone to contact customers and another to contact their narcotic source(s) of supply. In addition, narcotic traffickers and drug dealers often use different telephones to deal with different "lines" of customers. As another example, a drug dealer may use one telephone to contact customers who regularly purchase small, pre-packaged quantities of narcotics and another telephone for customers who regularly purchase larger quantities, or may use different

telephones to distribute different types of narcotics. Similarly, drug dealers whose business extends into multiple states, also sometimes use one telephone for local customers and another telephone for out-of-state customers. Finally, notwithstanding the foregoing, I know that drug dealers often utilize two or more cellular telephones interchangeably for all their narcotics trafficking undertakings. This enables distributors to accommodate a high volume of narcotics trafficking calls. The use of two or more telephones interchangeably also enables distributors to immediately terminate service on one telephone without crippling their illegal business, if they believe the telephone is being targeted by law enforcement for installation of a court-authorized wire-tap.

9. I know based upon my training and experience that most cellular telephones have two basic components: 1) a handset, i.e. the telephone device itself; and 2) a chip, or SIM card (i.e. Subscriber Identity Module Card), which is inserted into the handset, and which can easily be removed and transferred to another handset. A handset is inoperable without a SIM card, except where it is used to place emergency 911 calls. I know, moreover, based upon my training and experience, and my investigation in this case, that cellular service providers maintain the following information, or identifiers, regarding each cellular telephone to which they provide service: (a) MSISDN, or Mobile Station ISDN, which is the ten-digit telephone number; (b) IMEI/ESN, or International Mobile Equipment Identity/Electronic Serial Number, which is the unique serial number assigned to the handset device itself; and (c) IMSI, or International Mobile Subscriber Identity, which is a unique 15-digit code associated with the mobile subscriber and which is stored on the SIM card that is inserted into the handset. When a SIM card is inserted into a handset, and the handset is turned on, the SIM card transmits the telephone number, IMSI

and IMEI associated with the cellular telephone to cellular telephone networks, thus registering it with the networks so that communications to and from the cellular telephones can be facilitated.

10.     I am assisting the U.S. Marshal's Service in an ongoing federal criminal investigation of DELROY ANDERSON for violation of 18 U.S.C. § 3146 (failure to appear). I am involved in this investigation and as a result of my participation have received information from other law enforcement officers, including the U.S. Marshal's Service and other federal agencies, and I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit.

11.     The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to establish that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

12.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

13.     Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 3146 (failure to appear) has been and is being committed by DELROY ANDERSON. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B, and to search the information described in Attachment A in an effort to locate ANDERSON as described further below.

**PROBABLE CAUSE**

14. On February 20, 2020, ANDERSON, a.k.a. "Max," was charged by federal indictment with conspiracy to commit money laundering and seven substantive counts of money laundering in *United States v. Anderson et al.*, 3:20CR30 (KAD). He was arrested on March 12, 2020, and, after his initial appearance and arraignment, was released subject to certain conditions. *See* Doc. No. 8 in 3:20CR30 (KAD). These conditions included standard ones like that he "not violate federal, state or local law while on release," and certain special conditions including that travel was restricted to the state of Connecticut without prior approval by Probation; that ANDERSON avoid all contact with any witness, victim, co-defendant or identified suspect; and that any financial transaction over $1,000 per day be brought "in advance if possible, to [the] attention of probation." Doc. No. 8 in 3:20CR30 (KAD) at 2.

15. Despite multiple bond hearings since ANDERSON's arrest, he has remained at liberty while awaiting trial. Jury selection is currently scheduled for May 18, 2022 before Judge Dooley.

16. On February 15, 2022, the government filed a motion for pretrial detention (Doc. No. 158). The basis for the government's motion was ANDERSON's alleged multiple violations of the Court's order of release on conditions, which included both possible violations of law as well as the Court's specific conditions of release. *See* Doc. No. 158 in 3:20CR30 (KAD).

17. The next day, on February 16, 2022, the Court issued a notice for a hearing on the motion to be held on Friday, February 18, 2022 at 2:00 p.m. at the federal courthouse in Bridgeport. Notice was provided the parties.

18. On February 17, 2022, a notice was docketed on ANDERSON's criminal case for a change of plea hearing set for February 18, 2022 at 12:15 p.m. at the federal courthouse in Bridgeport. Notice was provided to the parties.

19. On February 18, 2022, counsel for the government and defense counsel appeared for the 12:15 p.m. change of plea hearing. ANDERSON did not appear. At approximately 12:55 p.m., the Court opened court and confirmed with counsel that neither party knew the whereabouts of ANDERSON. Defense counsel represented to the Court that ANDERSON had been notified of the day's scheduled proceedings. Upon the government's request, the Court issued a warrant for ANDERSON's appearance based on ANDERSON's failure to appear and the strength of the government's motion for pretrial detention.

20. ANDERSON did not appear in Court on February 18, 2022 and, to date, ANDERSON's whereabouts are unknown. Since that time, the DEA has been working with the USMS to find Anderson and arrest him on the outstanding warrant.

21. Despite the fact the Court had ordered ANDERSON to turn his passport in at the time of his arrest in March 2020, it does not appear that ANDERSON did, indeed, turn in his passport as directed. ANDERSON's current U.S. passport expires in 2025, although the government has no current information that there has been outbound travel from the United States.

22. Based on a phone analysis, the government has identified the Target Telephone as a number being utilized before and after February 18, 2022, and as a number that is currently active. The Target Telephone is registered in ANDERSON's name and registered to an address of a UPS store in Riverside, Connecticut. The Target Telephone account was opened with AT&T on October 9, 2021 and the contact phone number listed ends in 6846. ANDERSON's

supervising pretrial services officer had the 6846 as one of the contact numbers for ANDERSON, but did not, to your Affiant's knowledge, have the Target Telephone number as one for ANDERSON.

23. Toll records reveal that the Target Telephone has been in contact with phone numbers of several individuals closely associated with ANDERSON, including the mothers of his children. For example, the Target Telephone has been in contact with a telephone number registered to D.M., one of ANDERSON's ex-partners, 199 times from February 4, 2022 through February 22, 2022. The Target Telephone has also been in contact with a telephone number registered to C.D., another one of ANDERSON's ex-partners, 58 times from February 4 through February 21, 2022.

24. It is believed that issuance of this warrant will allow agents and officers to determine the location of ANDERSON and will enable agents and officers to effect his arrest in a manner which best ensures the safety of law enforcement officers, the community and ANDERSON himself. I know from my investigation of ANDERSON that he does regularly communicate by telephone and that he has used telephones in the past to conduct his criminal activity including money laundering and marijuana distribution. It is reasonable to assume that ANDERSON carries his telephone on his person and I believe that the Target Telephone will show where ANDERSON is located for the purposes of executing the outstanding arrest warrant and may also provide evidence of his ongoing criminal activity. Specifically, aside from locating ANDERSON himself, I expect to find evidence of criminal activity on the Target Telephone, including but not limited to communications with others concerning his whereabouts before and after February 18, 2022 when he failed to appear in Court as directed. As such I am seeking prospective cell-site data.

### Cell-Site Data

25. Based on my training and experience, I know that the Provider can collect cell-site data on a prospective basis about the Target Telephone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

26. Based on my training and experience, I know that Provider maintains timing advanced per call measurement data, which the Provider also refers to as the "real-time tool" (RTT). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

### E-911 Phase II / GPS Location Data

27. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As

9

discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

28. Based on my training and experience, I know that Provider can collect E-911 Phase II data about the location of the Target Telephone, including by initiating a signal to determine the location of the Target Telephone on Provider's network or with such other reference points as may be reasonably available.

## Pen-Trap Data

29. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## Subscriber Information

30. Based on my training and experience, I know that wireless providers such as Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Telephone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

31. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

32. I further request that the Court direct Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

33. I also request that the Court direct Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall

reasonably compensate Provider for reasonable expenses incurred in furnishing such facilities or assistance.

34.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days "after the collection authorized by the warrant has been completed." There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

35.     Because the warrant will be served on Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

Respectfully submitted,

ANDREW HOFFMAN
Digitally signed by ANDREW HOFFMAN
Date: 2022.02.25 16:17:29 -05'00'

Andrew M. Hoffman
Special Agent, DEA

Attested to by telephonic communication on this 25th day of February 2022 by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1.

S. Dave Vatti
Digitally signed by S. Dave Vatti
Date: 2022.02.25 16:22:58 -05'00'

THE HONORABLE S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number (203) 219-9777 (Target Telephone), whose wireless service provider is AT&T Wireless.

2. Records and information associated with the cellular device assigned (203) 219-9777 (Target Telephone), with listed subscriber DELROY ANDERSON that is in the custody or control of AT&T Wireless (referred to herein and in Attachment B as the "Provider"), a wireless provider that is headquartered in Dallas, Texas.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to Target Telephone listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with Target Telephone for the time period October 9, 2021 to the present.

  i. Names (including subscriber names, usernames, and screen names);

  ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii. Local and long-distance telephone connection records;

  iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol (IP) addresses) associated with those sessions;

  v. Length of service (including start date) and types of service utilized;

  vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers (ESN), Mobile Electronic Identity Numbers (MEIN), Mobile Equipment Identifier (MEID); Mobile Identification Number (MIN), Subscriber Identity Modules (SIM), Mobile Subscriber Integrated Services Digital Network Number (MSISDN); International Mobile Subscriber Identity Identifiers (IMSI), or International Mobile Equipment Identities (IMEI);

  vii. Other subscriber numbers or identities (including the registration Internet Protocol (IP) address); and

      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

      ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Telephone, including:

      (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      (ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from Target Telephone for a period of 30 from the date of this warrant, including:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which Target Telephone will connect at the beginning and end of each communication.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, under the same docket number, for such information associated with Target Telephone.

c. Information about the location of Target Telephone for a period of 30 days from the date of this warrant, during all times of day and night. "Information about the location of Target Telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, including Real Time Tool and "RTT" data.

    i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location

       Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of Target Telephone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violation 18 U.S.C. § 3146 (failure to appear) involving DELROY ANDERSON.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by AT&T Wireless ("Provider"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Provider. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Provider, and they were made by Provider as a regular practice; and

    b.    such records were generated by Provider's electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Provider in a manner to ensure that they are true duplicates of the original records; and

        2.    the process or system is regularly verified by Provider, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                            Signature